UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

CATHY JEAN PETERS,                     )
                                       )
    Plaintiff,                         )
                                       )
vs.                                    )     CV 07-B-1226-E
                                       )
HARTFORD LIFE AND ACCIDENT             )
INSURANCE COMPANY,                     )
                                       )
    Defendant.                         )

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 20.)[1] Plaintiff Cathy Jean Peters, who is proceeding pro se, has sued defendant Hartford Life and Accident Insurance Company, alleging that it wrongfully denied her claim for disability benefits. Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 20), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  STATEMENT OF FACTS

Defendant "issued Group Policy No. GRH-205215 to Wal-Mart Store, Inc. [plaintiff's employer] to insure the short-term disability component of Wal-Mart Stores, Inc. STD [short

term disability] Plan." (Doc. 21, Ex. A ¶ 4.) Wal-Mart's STD Plan is a qualified ERISA[2] plan. (*Id*. ¶ 3 and ex. 2 at 14.) Defendant "serves as the Claims Administrator with responsibility for adjudicating claims for short-term disability benefits made by participants of the Plans." (*Id*. ¶ 5; *see also id*., ex. 2 at 17.) "The Plan has granted [defendant] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (*Id*., ex. 2 at 17.)

The policy provides benefits when an eligible employee "1) become[s] Totally Disabled; 2) remain[s] Totally Disabled; and 3) submit[s] Proof of Loss to [defendant]." (*Id*. at 7.) The policy defines "Totally Disabled" as –

> You are prevented from performing the Essential Duties of Your Occupation or a Reasonable Alternative Job offered to You by the Employer.
>
> Your Disability must result from:
>
> > 1) injury;
> > 2) sickness;
> > 3) mental illness;
> > 4) substance abuse; or
> > 5) pregnancy
>
> Reasonable Alternative Job means a job with the Employer, within the same general location, the Essential Duties of which You are able to perform, and which considers Your prior education, training or experience, and with a rate of pay greater than 50% of Your Pre-disability Earnings.

---

[2] Employment Retirement Income Security Act of 1974, codified at 29 U.S.C. § 1001, *et seq*.

(*Id*. at 4.)  An "Essential Duty" is defined in the policy as "a duty that:  1) is substantial, not incidental; 2) is fundamental or inherent to the job; and 3) cannot be reasonably omitted or changed."  (*Id*. at 3.)

With regard to "Proof of Loss," the policy states:

Proof of Loss may include but is not limited to the following:

    1) documentation of:

        a) the date Your Disability began;
        b) the cause of Your Disability;
        c) the prognosis of Your Disability;
        d) Your Pre-disability Earnings, Current Weekly Earnings or any income, including but not limited to copies of Your filed and signed federal and state tax returns; and
        e) evidence that You are under the Regular Care of a Physician;

    2) any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;

    3) the names and addresses of all:

        a) Physicians and other qualified medical professional You have consulted;
        b) hospitals or other medical facilities in which You have been treated; and
        c) pharmacies which have filled Your prescriptions within the past three years;

    4) Your signed authorization for Us to obtain and release:

        a) medical, employment and financial information; and
        b) any other information We may reasonably require;

    5) Your signed statement identifying all Other Income Benefits; and

>> 6) proof that You and Your dependents have applied for all Other Income Benefits which are available.
>
> You will not be required to claim any retirement benefits which You may only get on a reduced basis. ***All proof submitted must be satisfactory to Us***.

(*Id*. at 10 [emphasis added].)

Plaintiff submitted a claim for disability benefits by telephone on October 13, 2006. (Doc. 21, Ex. A, ex. 1 at 62.) According to the record, plaintiff identified her job function as "grocery ICS team," and she told defendant that the functional requirements of her job were "unload trucks, put up stock zoning, standing, climbing ladders, reaching, [and] bending." (*Id*. at 63.) She said she was unable to perform all of the functional requirements of her job. (*Id*.) Defendant's representative noted that plaintiff had reported her medical conditions as "hyperten[s]ion/legally blind." (*Id*.) Defendant noted:

> [Date of disability]:  9/21/06
> [Last day worked]:  8/6/06
>
> . . .
>
> [Restrictions and limitations]:  [lie] flat when [blood pressure] increases
>
> . . .
>
> History of Medical Condition: [Employee] states 8/26/06 [blood pressure was] 160/100.  [Employee] states [she] need's [sic] special glasses, but can't get them until her blood pressure is under control
>
> Current Symptoms:  flushed, dizziness, lightheaded, weak, sweaty.

(*Id*. at  62-63.).

On October 18, 2006, defendant sent plaintiff a letter, which stated:

> We are writing to advise you that we have not yet received the required information from your physician. Please request that your physician's office contact us immediately . . . to provide specifics regarding your ***functional capabilities and limitations***.
>
> This is needed to complete your Short Term Disability claim and allow us to begin our evaluation. If this information is not received by 11/3/2006, your claim will be closed due to lack of information.

(*Id*. at 50 [emphasis added].)

On October 23, 2006, Dr. Kent Keys, plaintiff's eye doctor, called defendant.[3] (*Id*. at 61.) He told defendant that plaintiff could not afford glasses and that plaintiff did not have any known restrictions or limitations. (*Id*. at 62.) Also on October 23, 2006, defendant called the office of Dr. Michael Herdon, one of plaintiff's physicians. (*Id*. at 61.) Defendant noted that Dr. Herndon's office reported:

> Check [blood pressure]  160/102 – Oct. 12.  [T]ake blood pressure and continue meds . . . . [Follow-up] in 2 weeks to see if medication has helped bring down pressure. No glasses until [blood pressure] is normal. Must get it in normal range – cannot tell if visual problems are [related to high blood pressure] or actual visual issues. . . . Systolic has been over 200. [P]assing out secondary to uncontrolled [blood pressure]. [A]t risk to perform job functions.
>
> Has her on medical leave from 9/21/06 – [return to work] 11/01/06.

(*Id*.)

---

[3]Defendant's record of this call indicates only that a "physician" talked with defendant about plaintiff's glasses and treatment for eye irritation and cataracts. (Doc. 21, Ex. A, ex. 1 at 61-62.) According to plaintiff's statement regarding her medical treatment, Dr. Keys is her only eye doctor. (*See id*. at 134.) Therefore, the court assumes for purposes of summary judgment that Dr. Keys contacted defendant.

On October 30, 2006, Dr. Keys reported to defendant that plaintiff would be out of work until November 11, 2006, because "[i]t will take 10 days to receive glasses." (*Id*. at 59.)

On October 31, 2006, defendant's claims examiner was told by Dr. Herndon's nurse that plaintiff had not been seen by Dr. Herndon in August 2006, and she had one appointment in September and one appointment in October. (*Id*. at 58.) Dr. Herndon's office sent defendant five pages of medical records for plaintiff. (*Id*. at 58, 205.) The medical records showed that Dr. Herndon had diagnosed plaintiff with "hypertension" on September 21, 2006. (*Id*. at 206-07.) On that day, plaintiff's blood pressure was 148/80. (*Id*. at 207.) He prescribed Altace, Cardizem, Attenocol, and Micardis. (*Id*. at 206.) At plaintiff's next visit on October 12, 2006, her blood pressure was 160/102. (*Id*. at 208.) Dr. Herndon advised plaintiff to continue her medications. (*Id*. at 208.) At her follow-up visit on October 27, 2006, plaintiff's blood pressure was 130/90 and Dr. Herndon advised her to continue her medications. (*Id*. at 209.) The records do not indicate any restrictions or limitations on plaintiff's ability to work due to high blood pressure. (*See id*. at 206-10.)

On November 1, 2006, plaintiff told defendant that "people at the store could see her changing colors and [the] manager was afraid of her working." (*Id*. at 57.) She further stated that "she was aware of hypertension since [September of 2005,] but it took her that long to get [an attending physician] that would help her." (*Id*.) She told defendant that her medications "would make her unable to get to work on time or keep her out . . . ." (*Id*.)

On November 15, 2006, Cynthia Swann, defendant's Claims Examiner, wrote to plaintiff and stated:

> . . . We have completed our review of your claim for benefits and have determined ***the medical information received on your claim does not support total disability*** beyond your 14 day waiting period. Accordingly, [short-term benefits] are not payable to you under the terms of this policy.
>
> . . .
>
> We based our decision to deny your claim for benefits on policy language and all of the documents contained in your claim file, viewed as a whole, including the following specific information:
>
> 1) Telephonic claim filed by you on October 13, 2006.
> 2) Telephonic claim filed by Dr. Keys on October 23, 2006.
> 3) Medical records received from [Dr. Herndon] on November 1, 2006.
> 4) Employer information received on October 18, 2006.
>
> The medical information received on your claim advised that you were treated for uncontrolled hypertension and myopia on September 21, 2006. ***The information provided does not substantiate the presence of a functional impairment that would prevent you from being able to perform the essential duties of your occupation beyond your 14 day waiting period***. Therefore, we are denying benefits.
>
> The following information, not previously submitted, is necessary for a determination of your claim. Specifically, ***you should send test results, office visit notes, restrictions and limitations from September 21, 2006 through the present. That information is necessary to substantiate total disability***. If you'd like this information considered, we must receive it as soon as possible.
> . . .

(*Id*. at 47-48 [emphasis added].)

On February 14, 2007, plaintiff wrote to defendant requesting reconsideration of the denial. (*Id*. at 184.) Included with her request was her summation of her medical treatment in 2005 and the first half of 2006. (*Id*. at 188, 190-91.) Plaintiff also stated:

> I had used my vacation time, personal leave and sick leave with high blood pressure, frequent colds or flu and knowledge of drug reaction. With my [r]espect for the [i]ndividual working in grocery with running mucous not being able to work in freezers or coolers reaction to sudden change in temperature, I had been given warning for attendance, I was sick and my vision was changing with my blood pressure sometime I could see the labels and again sometime I could only do features. Handling food with running mucous was a major problem for me and no one could tell when I might go to sneezing. I was not able to work full time. Management had changed my work schedule to 10:00 a.m. until 7:00 p.m., working at night was a problem because the other associates objected to me not working outside in cold gathering shopping carts. The coolers in the diary department went out, and every hand was needed to help re-stock, and I could not work with the team to re-stock.

(*Id*. at 191.) Also, she stated that Dr. Herndon had released her for six months and told her she could purchase her glasses. (*Id*. at 195.)

Swann acknowledged receipt of plaintiff's additional information. (*Id*. at 46.) However, she told plaintiff –

> . . . The information provided were statements from you. Benefits are determined by ***medical information*** such as office notes and test results ***reported by the physician's [sic] treating you***. Since there were no medical records received, there was no information to review.
>
> On November 15, 2006, you were advised of your appeal rights. If you wish to appeal you will need to submit your request in writing. Your recent correspondence did not indicate you were appealing. If this was your intent, please clarify and we will refer your file to the appeal unit for review.

(*Id*. [emphasis added].)

9

On April 12, 2007, plaintiff wrote defendant; she stated:

Please find herein enclosed my statement of appeal of my disability. Your files should have medical records from all medical physicians listed. If this is not true, please inform me of the files that are missing.

I, Cathy Jean Peters, did pay premiums not wanting to be sick, but now that I am sick I do believe that I should receive this benefit. Due to the lack of such medical disability benefit I have lost other benefits.

(*Id*. at 146.)

Deanie Wallis, defendant's Appeal Specialist reviewed plaintiff's claim. (*Id*. at 52.) She found "[t]he evidence [did] not establish disability." (*Id*. at 53.) She noted, "We have none of the medical records except for some documentation [from Dr. Herndon] related to [treatment] for hypertension. . . . There are no [restrictions and limitations] noted. [Blood pressure] was not dangerously high on 9/21/06 [although plaintiff] did require medication [treatment] and was much better controlled at the 10/27/06 visit." (*Id*. at 52-53.) Wallis sent plaintiff a letter denying her appeal, which stated:

We received your 4/12/07 appeal letter on 4/19/07. You provided us with a timeline of your medical treatment since October 2005, but ***you have not provided any additional medical documentation***.

Please refer to the enclosed copies of our 11/15/06 and 3/9/07 letters. The 11/15/06 letter included the definition of Disability that applied to your claim and the evidence contained in our file. . . . ***There are no restrictions or limitations noted and there is no evidence that you were advised not to work***.

***The available medical documentation does not establish disability during the Elimination Period*** and the decision to deny benefits is upheld.

This is our final determination with respect to your appeal, our record is closed and no further review will be conducted with respect to this matter.

10

(*Id*. at 43 [emphasis added].)

## III. DISCUSSION

Plaintiff has sued defendant alleging that she is entitled to disability benefits. Defendant contends that its decision to deny plaintiff's claim for short-term disability benefits was correct based upon the terms of the Plan and plaintiff's medical records. Also, defendant contends that, even if its decision was not correct, it was reasonable.

The policy at issue in this case is part of an ERISA Plan. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)(quoting *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 148 (1985)*; Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90, 103 S. Ct. 2890, 2896, 77 L. Ed. 2d 490 (1983))(internal quotations omitted). Congress did not establish the standard of review for actions challenging benefit determinations in ERISA-regulated plans. *Id*. at 109. However, the Supreme Court has held, "[A] denial of benefits . . . is to be reviewed under a de novo standard[4] unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115.

> On the other hand, the Court said that where the administrator exercises discretion, deferential (i.e., arbitrary and capricious) review is appropriate . .

---

[4]"De novo" is Latin for "anew." BLACK'S LAW DICTIONARY (8th ed. 2004). "De novo review requires the court to make a judgment independent of the [administrator's decision], without deference to [the administrator's] analysis and conclusions." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001).

11

> . . Finally, the Court observed that when an administrator with discretion operates under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.

*Doyle v. Liberty Life Assur. Co. of Boston*, 511 F.3d 1336, 1339-40 (11th Cir. 2008)(quoting *Firestone Tire*, 489 U.S. at 111, 115)(internal quotations and footnote omitted).

In this circuit, "when an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs 'direct, immediate expense as a result of benefit determinations favorable to [p]lan participants.'" *Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1561 (11th Cir.1990)(quoting *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir.1989)). "Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business." *Id.*, *quoted in Adams v. Thiokol Corp.*, 231 F.3d 837, 842-43 (11th Cir. 2000). Therefore, in the Circuit, "the abuse of discretion, or arbitrary and capricious, standard applies to cases such as this one, but the application of the standard is shaped by the circumstances of the inherent conflict of interest." *Id.* at 1563, *quoted in Torres v. Pittston Co.*, 346 F.3d 1324, 1329 (11th Cir. 2003).

"Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001)(citations omitted). If the decision is not wrong,

the court will affirm the decision without further inquiry into the self-interest of the fiduciary. *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004).

The court begins consideration of plaintiff's claim with the language of the policy. "ERISA's commands that a plan shall 'specify the basis on which payments are made to and from the plan,' § 1102(b)(4), and that the fiduciary shall administer the plan 'in accordance with the documents and instruments governing the plan,' § 1104(a)(1)(D) . . . ." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147-48 (2001).

The policy in this case defines disability as the employee's inability to perform her job duties. The record contains no medical evidence of limitations or restrictions on plaintiff's ability to perform her job duties. Therefore, the court finds that defendant's decision to deny plaintiff's claim for disability benefits based on the lack of medical documentation of disability was not wrong.

Because the court finds that defendant's decision to deny plaintiff's claim for disability benefits was not wrong; the court will affirm the decision and dismiss plaintiff's claim. *See Williams*, 373 F.3d at 1138.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 19th day of September, 2008.

_____
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE